**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **MICHAEL GARNER,** | ) | |
| **Petitioner,** | ) | **Civil Case No. 7:18cv00560** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **HAROLD CLARKE,** | ) | **By: Michael F. Urbanski** |
| **Respondent.** | ) | **Chief United States District Judge** |

Michael Garner, a Virginia inmate proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging due process violations related to a disciplinary conviction and loss of Class Level under the Earned Sentence Credit (ESC) system, which determines the rate at which prisoners accrue good-time credits. This matter is before the court on remand from the Fourth Circuit Court of Appeals to adjudicate the disciplinary due process claim in Garner's petition and to enter a final order herein. After reviewing the record, the court concludes that respondent's motion for summary judgment[1] must be granted.

## I. Background

Garner is in the custody of the Virginia Department of Corrections ("VDOC"), serving sentences totaling twenty-four years of incarceration on multiple 2010 convictions and a probation revocation. Upon his entry into the VDOC on March 24, 2010, Garner was assigned to the ESC good-time earning system because his offenses were committed after 1995. Under the ESC system, an inmate may earn between zero and four and half days of sentence credits for every

[1] Respondent titled his motion as a motion to dismiss and attached exhibits, including an affidavit, upon which the court relies. Accordingly, the court converts respondent's motion to a motion for summary judgment and has given Garner appropriate notice. See Fed. R. Civ. P. 12(d); Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975); ECF No. 13.

thirty days he has served, based upon the Class Level to which he is assigned.[2] By statute, the Virginia Board of Corrections establishes "the criteria upon which a person shall be deemed to have earned sentence credits." Va. Code § 53.1-202.4. When he began serving his sentence, Garner was initially assigned to Class Level 1, which resulted in a projected good-time release date of March 19, 2029. Projected release dates assume that the inmate will continue to earn good-time at the present earning level and will not have earned good-time taken from him as a result of misbehavior. Loss of earned good-time, a change in good-time earning Class Level, or any other event that impacts the service of the total sentence may cause the projected release date to change. An inmate's good-time earning Class Level may change because of disciplinary charges, a change in classification assessment, or some other event that would impact an inmate's sentence.

While Garner was housed at Dillwyn Correctional Center, he was charged with an institutional Category I disciplinary offense, No. 103/198D,[3] threatening to commit/inciting a riot on March 26, 2017. Disciplinary Offense Report, Pet. Ex. A, ECF No. 1-2. The charge alleged that Garner was given a direct order, several times, to remove a sign from the back of his wheelchair. The sign read "stop snitching" according to the report. The report further alleged that Garner became very loud and disrespectful and increasingly aggressive, drawing a crowd of offenders in the dorm. Id.

[2] Pursuant to the ESC system, while in the VDOC, an inmate is eligible to earn good time credit at the following rates:

Class Level 1: 4.5 days for every 30 days served
Class Level 2: 3 days for every 30 days served
Class Level 3: 1.5 days for every 30 days served
Class Level 4: 0 days for every 30 days served.

[3] No. 198(d) is threatening to commit any Category I offense. No. 103 is "inciting to riot, rioting, or acting in a manner that disrupts the orderly operation of the institution." VDOC Op. Proc. 861.1(V)(A) (Jan. 1, 2016).

Pursuant to Virginia Department of Corrections (VDOC) Operating Procedures, Op. Proc. 861.1, when Garner was served with the disciplinary offense report on March 27, 2017, he was advised of several rights, including to have an inmate or staff advisor for his hearing, to request witnesses by submitting a Witness Request Form within 48 hours, to request documentary evidence by submitting a Request for Documentary evidence Form, and to question the Reporting Officer in person or by submitting questions on a Reporting Officer Response Form. Sims Aff., ¶ 6, Resp. Ex. 2, ECF No. 12-2. Garner promptly submitted four Reporting Officer Response Forms on that same day March 27, and Hearing Officer Sims approved all the questions; the Reporting Officer answered the questions on March 29, 2017. Id. at ¶ 9. Garner also submitted Witness Request Forms on March 27, but they were incomplete because they did not have the names of any witnesses, only bed numbers. Those forms were returned to Garner, advising him that they needed to be fully completed before the witness requests could be submitted and reviewed, accepted, or rejected. On March 31, Garner submitted four Witness Request Forms with the names of twelve prospective witnesses. The Hearing Officer denied the request, because the forms had not been submitted within the required 48-hours. Garner stated that he had trouble getting the witness' names and had repeatedly requested help. Id. at ¶¶ 11, 15 and attachments at 52–55.

At the hearing on April 3, 2017, Garner asked the Reporting Officer if he had prepared a confiscation form for the sign on the back of the wheelchair. The Officer responded that CO Copeland had prepared the confiscation form. Garner stated he had never received a copy of the form and asked what it said. The Officer stated it was a piece of paper that Garner had been instructed to remove two weeks earlier. Id. at ¶ 13. Garner contested what the sign said, saying it read only "I stopped snitching." Id. at ¶ 18. The Hearing Officer noted that he could not determine what the sign said, since it was not at the hearing; Garner said he had asked for the sign to be

brought to the hearing, but then admitted that he never completed and submitted a Documentary Evidence Form to request the sign. Id.

At the conclusion of the hearing, the Hearing Officer found Garner guilty and imposed a penalty of twenty days in disciplinary segregation. Thereafter, on April 10, 2017, Garner's good-time earning Class Level was changed to Level 4, meaning that he would not earn good-time credit while he remained at that level. On April 15, 2017, Garner appealed the disciplinary decision to the Facility Unit Head for his first level appeal, which the Warden denied on May 15, 2017. Disciplinary Appeal Response, Pet. Ex. E-4, ECF No. 1-6 at pp.7–8. The Offender Discipline Unit denied his second level appeal on July 21, 2017. Pet. Ex. F-3, ECF No. 1-7 at p. 4.

As a result of his reclassification on April 10, 2017, Garner's projected good-time release date was recalculated to November 4, 2031, rather than the previous release date of March 19, 2029. On July 5, 2018, Garner's good-time earning Class Level was changed again to Class Level 1, and his projected good-time release date was recalculated to May 9, 2029, approximately fifty-one days later than the projected good-time release date had been when he began serving his sentence. On March 24, 2018,[4] Garner petitioned the Supreme Court of Virginia for a writ of habeas corpus, challenging the disciplinary proceedings and the loss of good-time credit. The court dismissed his petition on June 25, 2018. Garner v. Clarke, No. 180437 (Va. June 25, 2018).

[4] Garner's notarized signature on his state petition is dated March 24, 2018, the earliest date on which he could have deposited the petition in the prison's institutional mail.

Garner filed the instant § 2254 petition on November 5, 2018,[5] claiming that he was denied due process during the disciplinary hearing and appeals process related to the 2017 disciplinary conviction, because he was denied witnesses and documentary evidence. He also complains about his recalculated projected good-time release date, arguing that he "lost" good-time credit. Garner seeks removal of the disciplinary conviction from his record and reinstatement of his lost good-time credit. Respondent has moved for summary judgment and the court will grant respondent's motion.

## II. Discussion

### A. Standard of Review

Before a federal court may consider a state prisoner's habeas claim, the prisoner must have exhausted his state court remedies. 28 U.S.C.§ 2254(b). This means that the petitioner must present his federal constitutional claims to the highest state court before he is entitled to seek federal habeas relief. O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). Failure to do so "deprive[s] the state courts of an opportunity to address those claims in the first instance." Coleman v. Thompson, 501 U.S. 722, 732 (1991). In this case, Garner exhausted his administrative remedies, having no other appellate options. Then, he filed a state habeas petition, raising the same issues he raises in this case. Even though the court did not consider the claims on the merits, because Virginia law deems claims regarding good-time classification and prison disciplinary proceedings improper for state habeas jurisdiction, Garner gave the state's highest

[5] November 5, 2018, the date Garner certified placing his § 2254 petition in the institutional mail, renders his petition untimely under 28 U.S.C. § 2244(d). The disciplinary proceedings became final on July 21, 2017, when Garner had exhausted his administrative remedies. See Wade v. Robinson, 327 F.3d 328, 333 (4th Cir. 2003). The one-year statute of limitations began running on that date, and 246 days elapsed before he filed his state habeas petition on March 24, 2018, when the statute was tolled with 119 days remaining. The Supreme Court of Virginia dismissed his habeas petition on June 25, 2018, and the statute resumed at that point. The 119 days expired on October 22, 2018, the last date on which Garner could timely file his petition in this court. However, the respondent did not raise timeliness as a defense, and that is not the basis for the court's decision in this case.

court the opportunity to consider the substantive issues, which is all that is required for exhaustion. Breard v. Pruett, 134 F.3d 615, 618 (4th Cir. 1998); Butts v. Clarke, No. 2:12cv210, 2013 WL 6408357, at *4 (E.D. Va. Dec. 6, 2013).

Further, because the state court did not adjudicate the merits of Garner's claim, the federal court must review his claims de novo. Butts, at *4. A court should grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is not material unless it could affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The material facts in this case are not disputed, that is the facts regarding the disciplinary hearing, what forms were and were not submitted, the outcome of the hearing, and the changes in Garner's ESC Class Level and resulting good-time credits.[6] Accordingly, the court will apply the existing law to those facts to see if the facts or any reasonable inferences from them support Garner's claims.

**B. Due Process**

The Fourteenth Amendment prohibits a state from depriving an individual of liberty without due process of law. U.S. Const. amend. XIV. A constitutionally protected liberty interest "may arise from the Constitution itself, by reason of guarantees implicit in the word liberty, . . . or it may arise from an expectation or interest created by state laws or policies."[7] Wilkinson v. Austin, 545 U.S. 209, 221 (2005). To determine whether an inmate has a protected liberty interest, the

[6] Garner's claims are strictly procedural due process claims. As such, the facts of the underlying offense are irrelevant to the inquiry.

[7] The court has omitted internal quotation marks, alterations, and citations here and throughout this memorandum opinion, unless otherwise noted.

court must look to the nature of the claimed interest and determine whether the Due Process Clause applies. See Board of Regents v. Roth, 408 U.S. 564, 570-71 (1972).

The Supreme Court has recognized that:

> Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a retraction justified by the considerations underlying our penal system. . . . But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime.

Wolff v. McDonnell, 418 U.S. 539, 555 (1974). Acknowledging that prisoners have a liberty interest in disciplinary procedures, the Court also noted that disciplinary proceedings are not criminal prosecutions and do not require "the full panoply of rights due a defendant in such proceedings." Id. at 556. The requirements of due process are flexible, depending on the procedural protections appropriate to the situation. Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

The Court later set forth a three-factor balancing test for determining what process is required by a given situation: (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of that interest based on the procedures adopted and the probable value, if any, of additional procedural protections, and (3) the Government's interest, considering the function involved and the financial and administrative burdens that would be imposed by additional procedural requirements. Mathews v. Eldridge, 424 U.S. 319, 335 (1976); Wilkinson v. Austin, 545 U.S. 209, 224–25 (2005). If no private interest exists, there is nothing to balance, as due process is not implicated. Wilkinson, 545 U.S. at 225. Accordingly, the court must determine what interests that Garner alleges have been infringed.

**1. Garner's ESC Class Level and Good-Time Credits**

Garner requests restoration of his "lost" good-time credit.[8] First, the court notes that there is no evidence to suggest that Garner lost any good-time credit that he had already earned. Rather, the only evidence is that the rate at which he prospectively earned good-time credit was reduced for a period of time following his disciplinary conviction. Second, Garner does not allege that was denied any procedural protections at any hearing related to his Class Level being reduced. However, even if his petition could be construed as alleging such, inmates have no liberty interest derived from the Constitution in earning good-time credit or in a particular good-time credit earning level. Wolff, 418 U.S. at 557. Thus, for Garner to succeed in his claim, he must show that Virginia laws or policies create a protected liberty interest for him in retaining his Class Level. Wilkinson, 545 U.S. at 221. Garner cannot make this showing.

"It is well established that Virginia inmates do not enjoy a protected liberty interest in the rate at which they earn either Earned Sentence Credits or Good Conduct Allowances." Dennis v. Clarke, No. 3:15CV603, 2016 U.S. Dist. LEXIS 110036, at *18, 2016 WL 4424956, at *6 (E.D. Va. Aug. 17, 2016) (citing many cases); Mills v. Holmes, 95 F. Supp. 3d 924, 931-34 (E.D. Va. 2015). In determining whether a protected interest exists, the court first examines the nature of the interest. An interest is "in the nature of a liberty interest" if its deprivation (1) "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" or (2) inevitably affects the duration of the inmate's sentence. Sandin v. Conner, 515 U.S. 472, 484. A review of VDOC procedures makes clear that an inmate's Class Level does not affect his

[8] The court notes that Garner has not established a direct connection between his disciplinary conviction and his reduced good-time earning Class Level. However, inasmuch as his good time earning Class Level was reduced seven days after his disciplinary conviction, it appears the reduction was based, at least in part, on the disciplinary conviction.

privileges, degree of physical restraint, or other aspects of the inmate's experience of his confinement; rather, Class Level affects only the rate at which good-time credit can be accrued and, thereby, the projected amount of time the inmate will remain confined. Thus, any claimed interest in an inmate's Class Level is one which affects the duration of his sentence and is, thus, in the nature of a liberty interest. See Wilson v. Jones, 430 F.3d 1113, 1117 (10th Cir. 2005); McGuinness v. Dubois, 75 F.3d 794, 798 n.3 (1st Cir. 1996); Orellana v. Kyle, 65 F.3d 29, 32-33 (5th Cir. 1995); Puranda v. Johnson, No. 3:08cv687, 2009 U.S. Dist. LEXIS 93226, at *12, 2009 WL 3175629, at *3 (E.D. Va. Sept. 30, 2009).

Next, the court must examine whether the state has created an "entitlement to that interest through mandatory language and substantive limits on official discretion." Mills, 95 F. Supp. 3d at 932. No constitutionally protected liberty interest is created if "either the primary decisionmaker or any reviewing authority is authorized to override, as a matter of discretion, any classification suggested by application of the prescribed substantive criteria." Id. at 933.

VDOC Operating Procedures ("OPs") 830.1 and 830.3 provide detailed procedures that prison officials must follow when modifying an inmate's Class Level.[9] An inmate's Class Level may be modified during his annual review of his classification or outside of his annual review through a Formal Due Process Hearing, as defined in the VDOC OP. Whether at a Formal Due Process Hearing or an annual review, an inmate's Class Level may only be reduced on the recommendation of the Institutional Classification Authority ("ICA") and the approval of the Facility Unit Head. VDOC procedures state that a Class Level reduction should be based on a "significant decline in any area of performance and responsibility to the extent that the offender

[9] The court takes judicial notice of these publicly available VDOC OPs. See Goldfarb v. Mayor & City Council of Balt., 791 F.3d 500, 508 (4th Cir. 2015) (explaining that court can take judicial notice of public record).

clearly has failed to maintain behaviors that led to advancement to the present class." To determine an inmate's Class Level, the ICA evaluates him based on a point system. Inmates may earn up to 100 points in three categories: "Infractions"; "Reentry Plan, Annual Goals"; and "Work." This point score and attendant Class Level can be rejected by the classifying authority by applying one of seven "approved overrides" that "must be justified with override numbers and supporting comments" from the ICA. An inmate's Class Level is only changed when the Facility Unit Head approves the ICA's recommendation.

Although VDOC regulations provide "substantive predicates" for awarding inmates a certain Class Level, the regulations do not *require* particular "substantive results" once those predicates have been established. This is so because the ICA may reject an inmate's point score and resulting Class Level assignment on the basis of one of seven overrides, which include a discretionary assessment that a point score in one area of evaluation is inordinately high or low or that a "significant recent decrease in an area of evaluation warrants a lower Class Level." The authorization of these subjective assessments to override an inmate's point score effectively "grant[s] absolute discretion to override [Class Level] determinations based on total point scores," permitting the ICA or the warden "to decide the [Class Level] to which an individual inmate may be assigned," regardless of his point score. James v. Robinson, 863 F. Supp. 275, 278 (E.D. Va.), aff'd, 45 F.3d 426 (4th Cir. 1994) (unpublished). Furthermore, the Facility Unit Head must approve the ICA action—that is, the eventual recommendation, considering the point score and any overrides—before a change in Class Level takes effect. In sum, the VDOC regulations fail to place substantive limitations on official discretion that would give rise to a legitimate claim of entitlement in retaining one's Class Level. See Mills, 95 F.Supp.3d at 934. Because Virginia's good conduct time programs endow officials with such discretion and place no substantive limits

on that discretion, whatever change a Class Level adjustment may render in an inmate's projected release date does not "inevitably affect" the actual length of time he will serve; thus, no constitutionally protected liberty interest is created under Sandin. Baker v. Clarice, No. 7:18cv00620, 2019 U.S. Dist. LEXIS 103763, at *9, 2019 WL 2552227, at *4 (W.D. Va. Jun. 20, 2019); Mills, 95 F. Supp. at 934. Accordingly, the court concludes that Garner did not have a constitutionally protected liberty interest in retaining his Class Level and, thus, he had no federal constitutional right to particular procedural protections during proceedings to modify his Class Level.

Garner also cannot demonstrate any constitutional deprivations arising from violations, if any, of state law or VDOC regulations at the hearing related to his Class Level.[10] While state regulations may provide for more stringent procedural protections than the Due Process Clause requires, "a state's failure to abide by its own law as to procedural protections is not a federal due process issue." Brown v. Angelone, 938 F. Supp. 340, 344 (W.D. Va. 1996) (citing Riccio v. Cty. of Fairfax, 907 F.2d 1459, 1469 (4th Cir. 1990)).

**2. Solitary Confinement**

As discussed in the previous section, the Supreme Court held in Sandin that an interest is in the nature of a liberty interest if its deprivation creates an atypical or significant hardship in relation to the ordinary incidents of prison life. Sandin, 515 U.S. at 484. Absent an interest in the nature of a liberty interest, an inmate's due process claim has no merit. Id. Finding that temporary solitary confinement is clearly contemplated by an inmate's original sentence, the Court in Sandin held that disciplinary segregation did not present the type of atypical, significant deprivation in

[10] As noted on page 8, Garner does not allege any violations of procedure in changing his Class Level, only that the change resulted from the disciplinary hearing in which he alleges his rights were violated.

which a state might create a liberty interest. Id. at 484, 486. See also Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991) (recognizing that to safely and efficiently run the prison, prison officials maintain broad discretion over an inmate's "location, variations of daily routines, changes in conditions of confinement (including administrative segregation), and the denial of privileges"); Beverati v. Smith, 120 F.3d 500, 502-04 (4th Cir. 1997) (rejecting a due process claim by inmates held in administrative segregation for six months after disciplinary charges were resolved). Because an inmate has no liberty interest in avoiding solitary confinement, there are no fixed constitutional procedural requirements under due process before solitary confinement may be imposed. Garner has not claimed that his placement in segregation for 20 days violated the Due Process Clause, but because this penalty was imposed for his disciplinary violation, the court addresses this issue to make clear that Garner has no constitutionally protected interest in avoiding disciplinary segregation.

**3. Disciplinary Infraction on Record**

The Supreme Court has recognized that prisoners have a liberty interest in disciplinary procedures. Wolff, 418 U.S. at 556. However, those rights are "subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." Id. In determining what level of process is due, the Court weighed the institutional needs and objectives of prisons against the inmate's liberty interest in the proceedings, noting that an inmate's interest in a disciplinary proceeding, though serious, is "quantitatively and qualitatively different from" criminal trials and revocation proceedings. Id. at 561. The prison's interests in maintaining the safety of both corrections officers and inmates, and in modifying criminal behavior, require that prison authorities be given flexibility in fashioning appropriate procedures to protect the inmate against "arbitrary action of the government." Id. at 558, 561–63.

Based on considering these factors, the Court identified the procedural due process requirements for inmate disciplinary proceedings before liberty interests may be taken from the inmate. The process due an inmate is: (1) advance written notice of the claimed violation, at least 24 hours before any disciplinary hearing; (2) a written statement by the factfinder, explaining the evidence relied upon and the reasons for the decision and any disciplinary sanction imposed; (3) the opportunity to call witnesses and present documentary evidence in his defense if doing so "will not be unduly hazardous to institutional safety or correctional goals." Id. at 563–66. Notably, the court expressly held that inmates are not constitutionally entitled to confront and cross-examine witnesses against them in prison disciplinary proceedings, nor are they entitled to counsel. Id. at 567–70.

The record herein establishes that Garner was afforded the required procedural protections. He was served written notice of the charges against him on March 27, 2017, at 8:35 a.m. Pet. Ex. A at 1. This was a full week before the disciplinary hearing on April 3. The hearing officer prepared a written explanation of his decision, summarizing the evidence upon which the finding of guilt was based. Id. at 2.

Garner's complaint is that he was denied the right to call witnesses and introduce documents for his defense. However, this is not the case. Garner was provided the necessary forms to request witnesses, documentary evidence, and even questions to submit to the complaining officer about the event. He was also advised that these forms were required to be returned within 48 hours. Sims Aff't at ¶ 6. On the same date that Garner was served notice of the violation, Garner submitted four Reporting Officer Report Forms to the Hearing Officer. Id. at ¶ 9. The Hearing Officer did not receive any witness request forms from Garner until March

31, 2017, well beyond the 48-hour limit.[11] Because Garner did not comply with the time limit, his request for witnesses was denied. Id. at ¶ 10. Garner stated that the reason for his delay in submitting the witness request forms was that he was trying to get people to help him get the names of the witnesses; as soon as he had the names to go with the bed numbers he already had, he submitted the forms. Id. at ¶ 11.

A prisoner's right to call witnesses is not absolute, and courts should not second-guess decisions to deny a witness, as courts are "far removed from the demands of prison administration." Brown v. Braxton, 373 F.3d 501, 505 ( 4th Cir. 2004). As the Court has noted:

> Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements. . .

Wolff, 418 U.S. at 566 (emphasis added). One of the Hearing Officer's duties in the Virginia Department of Corrections, before the hearing, is to give the timely-submitted witness request form to any witness requested by the inmate, giving the witness a deadline within which to provide a written statement and return the form. The Hearing Officer then reviews the completed form to determine if the statement is relevant to the charges, in which case the statement will be addressed at the hearing. Va. DOC Op. Proc. 861.1, § XIV(A)(1)(b) and (d). For category I offenses, such as Garner's, if the statement is relevant and non-repetitive, the Hearing Officer should ensure that the witness is present in person to testify at the hearing. First, the Hearing Officer reviews multiple hearing statements, not only for relevance but for repetitiveness; if the witnesses are repetitive, then only one is brought to the hearing. Inmates are not required to testify against their will. Id. at § XIV(B). These witness procedures survived constitutional attack in the Fourth Circuit.

[11] Garner stated that he provided a list of bed numbers as his witness list, originally, on March 27, but the forms were returned to him because he did not have names on them.

Brown, 373 F.3d at 509. Likewise, a court has found no denial of due process in denying witnesses for failure to comply with the 48-hour rule. Wallace v. Watford-Brown, No. 1:13cv319, 2015 WL 5827622, slip op. at *4 (E.D. Va. 2015) (unpublished).

Given the Hearing Officer's duty to manage the process efficiently and fairly, as set forth above, 48 hours is a reasonable time limit for an inmate to submit the names of witnesses. Indeed, that is twice as long as the Court requires for advance notice of a hearing. Wolff, 418 U.S. at 564. Particularly when Garner submitted the names of twelve witnesses on Friday, March 31, 2017, before a Monday, April 3, hearing date, the Hearing Officer would have insufficient time to determine if that many witnesses were relevant but not redundant or if there were other administrative reasons that the witness could not be present.

Nor does Garner's alleged difficulty obtaining the names of his witnesses change the analysis. Wolff does not require officers to assist an inmate in "investigating and procuring his witnesses and his documentary evidence for his defense." Brown v. Angelone, 938 F. Supp. 340, 344 (W. D. Va. 1996). In his first round appeal of the Hearing Officer's decision, Garner alleged for the first time that he had filled out the forms and placed them in the door to be picked up on the morning of March 29, 2017 and does not know why the Hearing Officer did not receive the forms until March 31. Level I Appeal, Pet. Ex. E at 3, ECF No. 1-6. This is not what Garner told Officer Sims at the hearing. See Sims Aff't at ¶ 15. When an administrative review is made available to an inmate, the review is limited to the charge made and the evidence presented at the hearing. Landman v. Royster, 333 F. Supp. 621, 653 (E.D. Va. 1971).

Garner also complains of not having received a confiscation form for the sign on his wheelchair, that the reporting Officer did not bring the sign to the hearing, and that no one has looked at the security video of the alleged incident. Garner failed to complete the form to request

any document or tangible item to be produced at his hearing. Sims Aff't at ¶ 18. Garner never mentioned the security video until his first level appeal. Procedures were available for him to request the items for the hearing. His failure to take advantage of those procedures is not a denial of due process. On administrative review, Garner had no right to introduce new evidence into the record. Landman, 333 F. Supp. at 653.

Garner received the benefit of all the procedural due process required in his prison disciplinary proceeding, and he is not entitled to have the disciplinary violation removed from his record. Further, he has not alleged the deprivation of a constitutionally protected interest requiring any further due process protection.

## III. Conclusion

When issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability. Fed. R. Gov.§ 2254 Cases 11(a). A certificate of appealability may issue only if the movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. 322, 338 (2003); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000). Garner has not made such a showing in this case.

For the foregoing reasons, the court will grant respondent's motion to dismiss, dismiss the petition for a writ of habeas corpus, and deny a certificate of appealability.

**ENTER:** This 15th day of March, 2021.

/s/ Michael F. Urbanski
Chief United States District Judge